## THE GEORGE L. GARLICK.

### In re MORAN.

(Circuit Court of Appeals. Second Circuit. February 27, 1901.)

### Nos. 64, 65.

1. COLLISION—EVIDENCE—REVIEW.

In an action for damages for a collision between a schooner and a tug and tow, where the testimony of the witnesses from the tug and schooner are most conflicting, and the opinion of the trial judge shows that the credibility of the witnesses was doubtful, his decision, based on the evidence of disinterested witnesses, will not be disturbed.

2. SAME—LIMITING LIABILITY.

Where there was conflicting evidence before the commissioner in proceedings to limit liability after collision, his decision as to the value of the vessel will not be disturbed.

3. SAME—APPRAISAL.

The value of the vessel and freight for the purposes of limitation of liability is to be assessed at no later period than the termination of the voyage during which the collision happened.

Appeal from the District Court of the United States for the Eastern District of New York.

The first of the above-entitled causes comes here on appeal from a decree of the district court, Eastern district of New York, holding the George L. Garlick solely responsible for a collision between the ice barge Stuyvesant, in tow of the Garlick, and the schooner Uriah F. Washburn, owned by the libelants. 88 Fed. 553. The second cause is here on appeal by petitioners from a decree limiting liability to the sum of $3,000. The collision occurred about 1 a. m., below Yonkers, on the Hudson river. There was very little wind from the northward, and the schooner, which had double-reefed her mainsail earlier in the night, was coming down the river, meeting the first of the flood tide at Yonkers. The steam towboats Niagara and Baker, with a large tow of about 48 canal boats, arranged in tiers of four boats each, on hawsers about 100 fathoms long, were proceeding up the river. At the tail of this tow was the tug Komuk, acting as a helper. The Garlick, with the Stuyvesant in tow on a hawser about 120 to 150 feet in length, had come up the river behind the Niagara's tow, and was passing the same on the eastward. When near the head of the tow, the schooner and the Stuyvesant came into collision, the latter striking the former on her port bow at a considerable angle. Both boats went over into the large tow, fetching up against the third tier from the forward end, and damaging the canal boat Breed. The owner of this last-named canal boat heretofore libeled the schooner in the Southern district of New York, but the libel was dismissed, and the schooner held free from fault. The evidence, most of which was taken in court, is voluminous, and extremely contradictory. The libelants' story is that the schooner was heading straight down that reach of the river; that the lights of the Niagara and her tow were seen ahead on the starboard hand; that the light on the Garlick, with the Stuyvesant in tow, was seen further off than the Niagara's tow, and on the schooner's port hand; that the schooner kept her course without change; that, as the Garlick approached, she sheered to the westward, across the schooner's bows, barely clearing the schooner herself, and bringing her barge in collision with the schooner, the barge hitting the schooner on the port bow, and carrying the schooner over to the westward against the Niagara's tow. The schooner alleges that she made no change of her course until just as the Garlick was passing ahead of her, when her head was starboarded, to go, if possible, to east; but not in time to produce much, if any, effect upon the heading of the schooner. The story of the Gar-

lick is that as she was passing up on the east side of the Niagara's tow the green light of the schooner became visible on her starboard bow, and that the course of the Garlick was not changed, inasmuch as the vessels were going green to green; that, when the schooner had approached within a few hundred feet, she showed both lights, showing that her course had been changed to the westward, whereupon danger signals were blown by the Garlick; but that the schooner kept on heading to the westward, and struck the stern of the barge, whose course, as well as that of the Garlick, had not been changed, but was all the time parallel to the side of the Niagara's tow.

Robert D. Benedict, for appellants.

Peter Alexander, for appellees.

Nelson Zabriskie, for certain claimants.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. All efforts to harmonize the evidence have proved hopeless. The testimony of the witnesses from tug and schooner is most unsatisfactory when consulted in print, and the opinion of the district judge indicates that the appearance of both these groups upon the stand did not add to their persuasiveness. Under these circumstances it seems the wiser course to turn to witnesses not connected with either side, and see whether their story confirms the theory of the Garlick sufficiently to warrant a reversal of the district court. Some propositions are clearly established by the proof. The colliding vessels were not coming together head on. One was to the eastward of the other; and, if both had continued up and down the river respectively, there would have been no collision. Both could not have changed their course to the westward, and produced the results described. It follows that one of them must be in fault; the other not. Moreover, it is manifest that the one whose change of course to the west produced the collision must, before such change, have been the easternmost of the two. Unless, therefore, the evidence of the disinterested witnesses should be found to indicate that the Garlick, while overtaking it, was nearer the Niagara's tow than the schooner was when passing it, the conclusions of the district judge should not be disturbed. One Terry, or Tyrrel, was the owner of the canal boat Bogart,—outside boat in the fourth tier. He says he was on deck, and noticed the Garlick as she lapped the tow, and again when she was about a length ahead of him, and noticed the schooner coming showing both lights. He says the tug passed up parallel with the tow about 150 feet off. The intelligence of the witness, as disclosed in his testimony, compares unfavorably with that of the other two disinterested witnesses. Moriarty, the pilot of the Komuk, testifies that she was tied up to the outside of the third tier from the rear of the tow when the Garlick passed him. The latter blew a whistle, which he took to be a salute to himself, and which he returned. The Garlick was then heading straight up the river, and about 500 to 600 to the eastward of him. After returning the supposed salute, he dropped back to the rear of the tow to take out two boats, and noticed nothing further until he heard the Garlick's alarm whistles, when he looked up, and saw the latter heading diagonally across to the westward towards the Niagara's tow, pulling over for the tow, and near the head tier. The Garlick

shut off the schooner's lights, but witness, by the lights in Yonkers, could see the schooner herself heading straight down, as near as he could see. Wood, the pilot of the Niagara, went into the pilot house about 12:20 p. m. According to his custom, he looked around, and saw the red light of the Garlick way in to the eastward. Subsequently he saw the schooner while still quite a long way off. He is confused and inexact as to the bearings of both vessels when first seen, but is very positive that the schooner was nearer to the Niagara and her tow than the Garlick was, and that the latter changed her course so as to go across the river in front of the schooner. Upon this state of the proof we do not feel warranted in reversing the decision of the district court.

The appeal in the proceeding to limit liability arises on the following facts: The collision occurred October 4, 1894, and the Garlick was attached November 16th. On November 20th two appraisers, and on November 23d a third one, were appointed by the court to appraise her value. They each made a sworn report November 27th, agreeing on a valuation of $3,000. The claimants prepared bonds for that amount, but subsequently changed their minds, and did not execute them. The vessel was thereupon sold by the marshal December 27, 1894, for $1,790, and the proceeds paid into the registry. On August 26, 1896, petition was filed to limit liability, and on August 1, 1898, an order of reference was made to the United States commissioner to take evidence, and make due appraisement of the value at the end of the voyage, October 4, 1894. He reported $3,000. Exceptions were filed and argued before the district judge, and the commissioner was sustained. From that decree appeal is taken.

There was conflicting evidence before the commissioner. Claimant and his partner, and four of the bidders who attended the sale in December, and made a somewhat cursory examination of the tug, testified to valuations ranging between $1,500 and $2,000. On the other hand, besides the sworn appraisals made, one of the appraisers, who has made a very careful examination, testified to a valuation of $3,000 as of October 4th. The commissioner saw and heard these witnesses, and, in view of this conflict, his conclusion on a question of fact will, ordinarily, not be disturbed; and we do not find in the results of this sale at auction, held three months afterwards, in the depth of winter, and after the Garlick had been in another collision, sufficient to warrant a departure from the usual practice. The last clause of admiralty rule 57, "If the ship have already been libeled and sold, the proceeds shall represent the same for the purpose of these rules," cannot be construed as providing that in the case specified the value of the vessel, freight, etc., for the purposes of limitation of liability, is to be assessed as of any later period than the termination of the voyage during which collision happened. The decrees of the district court are affirmed, with costs.